**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| ALAA M. ELGAOUNI, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>META FINANCIAL GROUP, INC., J. TYLER HAAHR, and DAVID W. LEEDOM, )<br><br>Defendants. ) | No. C 10-4108-MWB<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      This is a federal class action on behalf of purchasers of the common stock of Meta Financial Group, Inc. ("Meta Financial" or the "Company") between May 14, 2009, and October 18, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

**OVERVIEW**

2.      During the Class Period, Meta Financial operated as the holding company for MetaBank and Meta Trust Company and purported to provide various financial products and services, including statement savings accounts, money market savings accounts, NOW

("negotiable order of withdrawal," *i.e.*, interest-bearing checking accounts) and regular checking accounts, and certificate accounts. The Company claimed to focus on two core businesses, its regional retail banking business and a national payments business, both of which are conducted through its Meta Payment Systems ("MPS") division. Meta Financial's growing MPS division included a program to provide tax refund anticipation loans in connection with a tax preparation firm, prepaid debit cards for refunds with another major tax preparation company, and the iAdvance micro lending product, which was designed to provide a line of credit on prepaid cards, including the prepaid cards issued in association with tax refund loans provided by MetaBank partners.

3.       MPS was a crucial aspect of Meta Financial's business. In the Company's 2009 Form 10-K, for example, defendants reported that "$422.1 million of the Company's deposit portfolio is attributable to MPS. [And] [t]he increase in deposits arising from MPS has also allowed the Bank to reduce its reliance on higher costing certificates of deposits and public funds."

4.       Meta Financial's iAdvance product was targeted to people with poor or no credit, providing short-term credit to those customers who agreed to direct deposit their paychecks onto a MetaBank prepaid card. Instead of a typical debit card, however, MetaBank's prepaid cards charged $9.95 per month and $2 per ATM withdrawal.

5.       In addition to the fees charged for usage of the MetaBank prepaid card, the iAdvance loan program charged additional fees for loans tied to those cards. Meta Financial charged iAdvance customers an "advance fee" of $2.50 for each $20 increment borrowed, *i.e.* 12.5%. iAdvance customers were allowed until their next direct deposit (up to a maximum of 35

days) to pay their loans back; Otherwise, the money lent would be taken from the next paycheck direct deposited onto their MetaBank prepaid card.

6.      Assuming a customer had the maximum number of days (35) between his/her loan and next direct deposit, the "advance fee" of 12.5% for 35 days would be equivalent to an interest rate of about 130% annually. However, the effective interest rate climbs dramatically if the loans are taken out closer to pay day: For example, if a loan is taken out one week before pay day, the customer is still charged the same advance fee; consequently, that 12.5% fee for a shorter, one-week loan equates to an annualized interest rate of 650%.

7.      In addition, by requiring that iAdvance loan customers use MetaBank prepaid cards and direct deposit their paychecks, iAdvance was able to deduct loan payments from customer paychecks, while circumventing federal laws that protect a minimum income from garnishment and forbid garnishment from social security checks.

8.      According to confidential witness ("CW") 1, a former MPS employee from the Vendor Management Department who worked at the Company for approximately two years until s/he was laid off in January 2010, Meta Financial conducted a mass layoff in January 2010, terminating almost all of the personnel in the Credit Department. CW1 reported that s/he was aware of the following persons who were let go: Senior VP in charge of iAdvance, Trent Sorbe; iAdvance Vice President Cal DeJong; Marketing Manager Nicole Pullman; and several managers and staff-level personnel. According to CW1, s/he was informed that the layoffs occurred because the Company was "rethinking the forecasting for the division." CW3, a former Mortgage Loan Officer at Meta Bank who worked at the Company until June 2010, reported that approximately 30 MPS employees were laid off in January 2010, eliminating "an entire" division with MPS. CW3 reported that s/he was informed that the layoff related in some way to a "higher

up" executive in MPS not following protocol and, as a result, the MPS executive was let go, along with all of the people who worked under him.

9.     After this layoff, while interviewing for another position within the banking industry in August or September 2010, CW1 was informed by the interviewer that the Office of Thrift Supervision ("OTS") had stepped in at Meta Financial and was shutting down the iAdvance program. CW1 explained that the company s/he interviewed with probably knew this information because it had taken over a bank that previously employed several Meta Bank executives. CW3 also reported that s/he had heard that the OTS examination took place about a month after s/he left, around July 2010.

10.     However, CW1 reported that, well prior to the OTS shutting down iAdvance, OTS had been questioning the benefits of the iAdvance program. When asked about the OTS's investigation of iAdvance and the associated tax refund anticipation loan program, CW1 reported that the OTS "had been questioning that type of service since the prior year [2009.]" According to CW1, in late summer or early fall of 2009, iAdvance Marketing Manager Nicole Pullman and an iAdvance employee named Beth told CW1 that they were conducting customer surveys to document customer comments supporting the "good side" of iAdvance, which would be reported to the OTS.

11.     Nicole Pullman and Beth told CW1 that MPS had been trying to prove to OTS that iAdvance was a beneficial program for its customers because OTS "looked at it as a payday loan program." According to CW1, although iAdvance was supposed to be a short-term loan program for customers to make ends meet between paychecks, with the loans to be paid off quickly, in reality, "the same people were borrowing the same amount every week over and over." CW1 stated that customers normally borrowed the maximum amount they could every

week. CW1 noted that the OTS believed the program was not helping these customers because they were just continuing their borrowing habit and that these circumstances caused the OTS to question the benefits of the program to customers, as customers became reliant on iAdvance to survive and got further into debt because of the associated interest rates and fees. CW1's co-workers also told CW1 that because iAdvance customers were mostly low income and with limited education, OTS thought MPS was taking advantage of them with high interest rates and fees. CW2, who worked for MPS for about two years until s/he was laid off in January 2010, also stated that all of MPS's programs targeted low income persons. CW2 reported that s/he occasionally spoke with people in the Customer Service Department and learned that MPS had received a lot of customer complaints about iAdvance. In addition, CW2 reported that the program charged "exorbitant fees."

12.     Indeed, the ongoing, undisclosed OTS investigation finally came to light when, on October 12, 2010, defendants published a report with the Securities and Exchange Commission ("SEC") that revealed for the first time that the OTS had advised the Company on October 6, 2010, that the OTS had determined that the Company had "engaged in unfair or deceptive acts or practices" in violation of Section 5 of the Federal Trade Commission ("FTC") Act and the OTS Advertising Regulation in connection. The disclosure revealed that the OTS required Meta Financial to discontinue all iAdvance line of credit origination activity by October 13, 2010.

13.     In addition to the foregoing, the Company's report also revealed that the OTS had informed defendants that it planned to require the Company to reimburse borrowers under the iAdvance program. Moreover, the release also revealed that the discontinuance of the iAdvance program and the potential discontinuance of the tax-related programs would eliminate a

substantial portion of MPS's gross profit, and that the discontinuance of the iAdvance program could result in elevated rates of nonpayment on outstanding iAdvance loans.

14.     This report also stated that, based on the OTS's assessment of the Company's third-party relationship risk, enterprise risk management, and rapid growth (attributable to its MPS division), the Company was required to obtain written approval of the OTS Regional Director prior to:

- Entering into any new third party relationship agreements concerning any credit product, deposit product (including prepaid access), or automatic teller machine or materially amending any such existing agreements or publicly announcing any new third party relationship agreements or material amendments to existing agreements;

- Originating, directly or through any third party, income tax refund anticipation loans or other loans where the expected source of repayment is a tax refund; or

- Offering an income tax refund transfer processing service directly or through any third party during the 2011 tax season.

15.     On October 18, 2010, the Company followed up on its October 12, 2010, disclosure and revealed the Company had sought approval from the OTS to enter into any new third party relationship agreements—but had been denied.

16.     The revelations that the Company had materially misrepresented its financial and operational condition, the conditions and success of its iAdvance program and MPS division, its compliance with federal rules and regulations, and its controls and procedures, belatedly revealed on October 12, 2010, and October 18, 2010, caused shares of Meta Financial stock to fall precipitously. Over the course of these two disclosures, Meta Financial shares collapsed 60% in just five trading days, falling from a closing price of $33.23 per share on October 12, 2010, to close at $13.29 on October 19, 2010, on unusually high trading volume.

17.     This material decline in the Meta Financial shares was the direct result of shareholders learning, for the first time, that the statements made by defendants during the Class Period were materially false and misleading when made. Indeed, during the Class Period, defendants knew or recklessly disregarded that, *inter alia*:

- Defendants were in violation of OTS and FTC provisions prohibiting unfair or deceptive practices in commerce and prohibiting advertising that is inaccurate or misrepresents its services, including statements that, while technically accurate, would mislead a consumer.

- Defendants had advertised iAdvance as having a 12.5% "advance fee" when, in truth, that 12.5% advance fee equated, in some instances, to annual interest rates exceeding 650%.

- Defendants targeted low income and less educated customers in marketing its iAdvance program.

- Defendants required iAdvance customers to use Meta Financial prepaid debit cards and enroll in direct deposit, so that the Company could avoid laws prohibiting the garnishment of checks from low income individuals or paid by social security.

- Defendants had propped up the Company's financial results by engaging in illegal conduct, such that the Company was in violation of federal banking and trade rules and regulations.

- The OTS had been looking closely at Meta Financial's iAdvance program and questioning the program's benefits and viability.

- Defendants had materially overstated the Company's profitability and likelihood for future growth through the inclusion of the iAdvance revenues that had been earned improperly or illegally.

- Meta Financial lacked adequate systems of internal operational or financial controls, to ensure that the Company's reported financial statements were true, accurate or reliable or that the Company was in compliance with federal rules and regulations.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Meta Financial maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

21.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiff

22.     Lead Plaintiff **EDEN PARTNERSHIP,** set forth in its previously-filed certification, Dkt. No. 6-4, incorporated by reference herein, purchased the common stock of Meta Financial at artificially inflated prices during the Class Period and has been damaged thereby.

### Company Defendant

23.     Defendant **META FINANCIAL GROUP, INC.** is a corporation organized under the laws of the State of Delaware. It maintains its principal place of business and chief executive offices at 121 East Fifth Street, Storm Lake, IA 50588. Meta Financial operates as the holding company for MetaBank and Meta Trust Company, providing various financial services and generating various deposit products, including statement savings accounts, money market savings accounts, NOW and regular checking accounts, and certificate accounts. As of February 22, 2010, the Company operated 12 retail banking offices in Iowa and South Dakota, and one non-retail service branch in Memphis, Tennessee.

**Individual Defendants**

24.     Defendant **J. TYLER HAAHR** is, and during the Class Period was, Chief Executive Officer, President, Director and a Member of Executive Committee of the Board as well as Chief Executive Officer of MetaBank, President of MetaBank, President of Meta Trust of MetaBank. Defendant Haahr signed and certified the Company's Form(s) 10-Q and Form 10-K filed by defendants with the SEC during the Class Period.

25.     Defendant **DAVID W. LEEDOM** is, and during the Class Period was, Chief Financial Officer, Senior Vice President, Secretary, Treasurer and Member of Executive Committee of the Board of Directors of the Company. Defendant Leedom signed and certified the Company's Form(s) 10-Q and Form 10-K filed by defendants with the SEC during the Class Period.

26.     Defendant **BRADLEY C. HANSON** is, and during the Class Period was Executive Vice President, Director, and Member of Executive Committee of the Board of Directors as well as a Member of Meta Trust Committee, President of Meta Payment Systems, Director of MetaBank West Central, Executive Vice President of MetaBank and a Director of MetaBank West Central of MetaBank. Defendant Hanson signed the 2009 Form 10-K filed by defendants with the SEC during the Class Period.

27.     Defendant **TROY MOORE III** is, and during the Class Period was Chief Operating Officer, Executive Vice President, Member of Executive Committee of the Board of Directors as well as Chief Operating Officer of MetaBank and Executive Vice President of MetaBank. Defendant Moore signed the 2009 Form 10-K filed by defendants with the SEC during the Class Period.

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Meta Financial's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

29.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Meta Financial common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Meta Financial's business, operations, management and the intrinsic value of Meta Financial common stock; (b) enabled defendants to artificially inflate the price of Meta Financial shares; (c) enabled defendants to arrange the sale of millions of dollars of Meta Financial shares while in possession of material adverse non-public information about the Company; and, (d) caused plaintiff and other members of the Class to purchase Meta Financial common stock at artificially inflated prices.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS DURING THE CLASS PERIOD

**Materially False and Misleading Statements Regarding iAdvance and MPS**

30.    On July 6, 2009, Defendants filed an amended annual report, Form 10-K/A for fiscal year (FY) 2008, which ended September 30, 2008. Regarding iAdvance, the 2008 10-K/A stated:

> The iAdvance micro lending product, which is a program designed to provide a line of credit on prepaid cards, **is experiencing increasing consumer acceptance and performance and has thus far validated management's expectations. Expansion opportunities are currently being considered for this product.**

(Emphasis added).

31.    On December 10, 2009, defendants filed with the SEC their Form 10-K for FY 2009, the year which ended September 30, 2009. Regarding iAdvance, the 2009 10-K similarly stated:

> The iAdvance® micro lending product, which is a program designed to provide a line of credit on prepaid cards, **is experiencing increasing consumer acceptance and is being deployed by an increasing number of clients as a retention tool for their prepaid card programs.**

(Emphasis added).

32.    These statements regarding iAdvance were materially false and/or misleading when made because the "increasing customer acceptance and performance" was a result of Defendants' unfair and illegal sales, marketing, and advertising practices, which targeted low-income consumers and provided materially misleading information about the iAdvance product and terms. Contrary to the claimed "customer acceptance," CW 2 reported that MPS was receiving customer complaints regarding its iAdvance products and associated fees. Moreover, as reported by CW 1, Defendants knew, at least as early as the filing of the 2009 10-K, that OTS

was conducting a probe into iAdvance and Meta Financial employees were conducting customer

surveys in an attempt to justify the product to the OTS.

33.     In addition, the 2008 Form 10-K/A stated, regarding MPS:

In 2004, MetaBank created a division known as MPS, which issues various prepaid cards, consumer credit products, and sponsors ATMs into various debit networks and offers other payment industry products and services. MPS generates fee income and low- and no-cost deposits for MetaBank through its activities. As noted in the "Management's Discussion and Analysis of Financial Condition and Results of Operations," which is included in Item 7 of this Annual Report on Form 10-K/A, **MPS is expanding and playing a significant role in the Company's financial performance.**

34.     Regarding MPS, the 2009 Form 10-K stated, in relevant part:

*MPS Lending Activities.* MPS has a loan committee consisting of members of Executive Management, and is led by the Senior Vice President of Credit for MPS. The MPS Credit Committee (the "Committee") is charged with monitoring, evaluating, and reporting portfolio performance and the overall credit risk posed by its credit products. All proposed credit programs must first be reviewed and approved by the Committee before such programs are presented to the Company's Board of Directors. The Board of Directors is ultimately responsible for final approval of any credit program.

**The Company believes that well-managed, nationwide credit programs can help meet legitimate credit needs for prime and sub-prime borrowers, and affords the Company an opportunity to diversify the loan portfolio and minimize earnings exposure due to economic downturns. Therefore, MPS designs and administers certain credit programs that accomplish these objectives. <u>MPS' programs are managed prudently, in accordance with governing rules and regulations, and without unnecessary exposure to the capital base.</u> To this end, management believes that MPS administers its credit programs in conformance with federal and state laws, regulations, guidance, applicable association rules and regulations, as well as all standards and best practices for safe and sound lending.**

**MPS strives to offer consumers innovative payment products, including credit products.**

(Emphasis added).

35.     Defendants' statements regarding MPS were materially false and misleading

when made because, while defendants touted the division's "expan[sion]" and "significant role

in the Company's financial performance," they failed to disclose that this growth was only being

achieved through improper and illegal means that violated OTS and FTC regulations and

deceived customers. Further, the Company's credit programs were not "well-managed," or "managed prudently, in accordance with governing rules and regulations," but violated federal rules and regulations governing advertising and prohibiting unfair or deceptive acts in commerce.

36.     In addition, as one of the Company's purported "risk factors," the 2009 Form 10-K/A stated:

> ***MPS' products and services are highly regulated financial products subject to extensive supervision and regulation.***
>
> The products and services offered by MPS are highly regulated by federal banking agencies, state banking agencies, and other federal and state regulators. Some of the laws and related regulations affecting its operations include consumer protection laws, escheat laws, privacy laws, and data protection laws. Compliance with the relevant legal paradigm in which the division operates is costly and requires significant personnel resources, as well as extensive contacts with outside lawyers and consultants hired by MPS to stay abreast of the applicable regulatory schemes.

37.     The Company's 2009 Form 10-K also included "risk factors" regarding Meta Financial's regulatory obligations, stating:

> ***The Company operates in a highly regulated environment, and changes in laws and regulations to which we are subject may adversely affect the Company's results of operations.***
>
> The Company operates in a highly regulated environment and are [sic] subject to extensive regulation, supervision and examination by the OTS and the FDIC. See "Business – Regulation" herein. Applicable laws and regulations may change, and there is no assurance that such changes will not adversely affect the Company's business. In this respect potentially landscape-changing legislative proposals have been introduced in Congress, and by regulatory agencies with respect to their respective regulatory powers. Such regulation and supervision govern the activities in which an institution may engage including the activities of MPS, and are intended primarily for the protection of the Bank, its depositors and the FDIC. Regulatory authorities have extensive discretion in connection with their supervisory and enforcement activities, including but not limited to the imposition of restrictions on the operation of an institution, the classification of assets by the institution and the adequacy of an institution's allowance for loan losses. Any change in such regulation and oversight, whether in the form of restrictions on activities, regulatory policy, regulations, or legislation, including but not limited to changes in the regulations governing savings banks, could have a material impact on the Company's operations. It is unknown at this time to what extent legislation will be passed into law or

regulatory proposals will be adopted, or the effect that such passage or adoption will have on the banking industry or the Company.

\*       \*       \*

**MPS' products and services are highly regulated financial products subject to extensive supervision and regulation.**

The products and services offered by MPS are highly regulated by federal banking agencies, state banking agencies, and other federal and state regulators. Some of the laws and related regulations affecting its operations include consumer protection laws, escheat laws, privacy laws, and data protection laws. Compliance with the relevant legal paradigm in which the division operates is costly and requires significant personnel resources, as well as extensive contacts with outside lawyers and consultants hired by MPS to stay abreast of the applicable regulatory schemes.

38.     These "risk factors" were materially false and misleading when made because they failed to disclose that the Company was *already* failing to comply with *current* OTS and FTC regulations. Moreover, at the time of defendants' filing of the 2009 Form 10-K, but undisclosed to investors, the Company's iAdvance product was *already* under investigation by the OTS.

**Materially False and Misleading Statements and Omissions Regarding the OTS**

39.     Regarding the OTS, the Company's 2009 Form 10-K noted, in part:

The OTS has extensive supervisory and regulatory authority over the operations of savings associations. As part of this authority, the Bank is required to file periodic reports with the OTS and is subject to periodic examination by the OTS, as discussed above. **The last regular examination of the Bank was conducted in early 2009**.

OTS also has extensive enforcement authority over its regulated institutions. This enforcement authority includes, among other things, the power to compel higher reserves, the ability to assess civil money penalties, the ability to issue cease-and-desist or removal orders and the ability to initiate injunctive actions. In general, these enforcement actions may be initiated for violations of laws and regulations and unsafe or unsound practices. Other actions or inactions may provide the basis for enforcement action, including misleading or untimely reports. Except under certain circumstances, public disclosure of final enforcement actions by the applicable regulator is required. The federal banking agencies have adopted guidelines establishing safety and soundness standards on such matters as loan underwriting and documentation, asset quality, earnings standards, internal controls and audit systems, interest rate risk exposure and compensation and other employee benefits. Generally, any institution which fails to comply with these

standards must submit a compliance plan. (For further discussion, see "—*Standards for Safety and Soundness"* herein.)

40.     These statements were materially false and misleading when made because they failed to disclose that the iAdvance program was in violation of the OTS's Advertising Regulation and the OTS was *currently*, at the time of this statement, conducting an investigation into the Company's iAdvance program because, as reported by CW1, the OTS had concerns regarding the program's benefits and believed MPS was taking advantage of low-income and less educated customers by charging them high interest rates and fees.

**Materially False and Misleading Statements Regarding the Company's Financial Results**

41.     Throughout the Class Period, Defendants filed numerous press releases and Form 10-Qs revealing growing and "record" financial results, while failing to disclose that these revenues could not be maintained, both because they were achieved through illegal and improper means, and because the OTS was already investigating products within the Company's MPS division. For example:

42.     **2Q:F09 Results Announced.** On May 14, 2009, the first day of the Class Period, defendants published a press release announcing results for the second fiscal quarter of 2009, the period ending March 31, 2009. The press release, entitled "**Meta Payment Systems net income increases 61% over prior year,**" cited "Highlights," including, for example, that

- Meta Payment Systems (MPS) quarterly 2009 fee revenue was a record $33.0 million, 187% over 2008

- MPS quarterly net income of $3.5 million was 61% higher than the 2008 same quarter

- MPS filed eight patents during the 2009 second fiscal quarter relating to the addition of functionality and ancillary products to prepaid cards

- MPS second quarter average deposits of $531.1million up $186.8 million or 54% from the prior year quarter

(Emphasis added)

43.     The May 14, 2009, article noted that "Quarterly earnings were primarily driven by a $21.5 million increase in fee revenue from the Company's Meta Payment Systems (MPS) unit, a 187% increase over 2008. . ." and quoted President and Chief Executive Officer J. Tyler Haahr as stating:

> Adjusted for the reserve taken on two commercial loan relationships, our banking and MPS units performed as well as expected during the quarter given the unsettled economic picture. Despite the economic environment, our net interest margin expanded nicely and MPS had its biggest quarter ever in both revenue and income. We believe that the last half of the current fiscal year will benefit from a more productive asset utilization and additional emphasis on cost control.

44.     **3Q:F09 Results Announced**. On August 10, 2009, defendants published a release announcing purported results for the third fiscal quarter of 2009, the period ended June 30, 2009. This release, entitled "**Meta Financial Group, Inc. Reports Results for Third Quarter Meta Payment Systems fee income increases 109% over prior year,**" presented the following "Highlights" for the quarter:

- Meta Financial Group (MFG) quarterly net loss of $2.6 million

- **Meta Payment Systems (MPS) 2009 quarterly fee revenue of $15.7 million was 109% over 2008**

- MetaBank remains well-capitalized as both core and risk-based capital ratios improved from the prior quarter

- **MPS third quarter average deposits of $472.8 million up $130.4 million or 38% from the prior year quarter**

(Emphasis added).

45.     In addition to reporting that the Company had adopted a purportedly "more conservative approach" to valuing its assets, the August 10, 2009, release also quoted defendant Haahr, in part, as follows:

16

". . . **Meanwhile, our Meta Payment Systems unit continues to build on its industry leadership position as demonstrated by its continued exciting growth.** We remain well above the regulatory requirements to be considered well-capitalized and our approach to asset valuation taken this quarter, combined with efficiencies we've implemented at the retail bank and strong growth at Meta Payment Systems, positions us well as the overall economy stabilizes."

(Emphasis added).

46.     **"Record" 4Q:F09 and Full Year 2009 Results Announced**. On December 10, 2009, defendants published a release announcing purported "Record" setting results for the fourth fiscal quarter of 2009 and for full year fiscal 2009, the period ended September 30, 2009. This release also noted that "Meta Financial Group, Inc. Reports Results for Year and Fourth Quarter," including, that "**Meta Payment Systems division achieves record annual earnings of $4.1 million"** and **"**Meta Payment Systems (MPS) fiscal 2009 non-interest income was $77.4 million, up 122% over 2008**."** (Emphasis added).

47.     **1Q:F10 Results Announced**. On February 9, 2010, defendants published a release announcing purported results for the first fiscal quarter of 2010, the period ended December 31, 2009. In addition to reporting the private sale of almost $9 million of the Company's common stock, this release also stated, in part, that "Meta Financial Group, Inc. Reports 2010 First Quarter Results and Recent Developments." In addition to reporting that "Net Income Increases 77% over Prior Year," the release cited, as a "highlights" for the quarter, that "**Meta Payment Systems (MPS) 2010 first quarter net income was $0.9 million with non-interest income up 29%" and "MPS deposits at quarter end were up $124.9 million, or 27%, over same period last year."** (Emphasis added).

48.     The February 9, 2010, release also stated, in part:

- MFG completed two common stock private placements raising $8.9 million on the sale of 415,000 shares representing 13.5% of our current outstanding shares. The share sales were priced at recent market prices.

- This new capital will be deployed immediately to support MPS growth as several significant new sponsorship programs are being added and other current programs are being expanded.

- Current season income tax-related programs are trending positively and reflect revenue expansion in the new refund transfer (RT) program.

- **MPS completed a strategic restructuring that resulted in a reduction of 47 positions and a refocusing of the division's resources on its core businesses, producing better alignment with its large business-to-business clients. The move will also yield significant cost savings during the 2010 fiscal year with no net impact on current revenue streams.**

\* \* \*

**The Company believes that restructuring-related cost savings will result from reorganizing its Meta Payment Systems division to concentrate the unit's activities on its fundamental business-to-business servicing and to discontinue certain product development efforts.** Further, the Company expects that the recent capital raises will support its balance sheet growth associated with the significant additional no-cost deposits resulting from expanding several existing relationships and advancing implementation of opportunities in the pipeline. **The Company anticipates that revenue momentum will be maintained and earnings capacity will be enhanced through the reduction of the Company's operating expenses.**

(Emphasis added).

49.     The February 9, 2010 release also quoted defendant Haahr, who made positive comments about the near-term health and viability of the Company, in part, as follows:

President and Chief Executive Officer J. Tyler Haahr commented, "**We are very pleased with our first quarter results across the entire enterprise as the Company's core businesses – retail banking and payment systems were profitable**. These encouraging results, coupled with an $8.9 million addition to capital in January, new and expanded business relationships to profitably utilize the capital, and a program to reduce operating expenses by nearly $5 million annually, cause us to be optimistic about our ongoing performance. In addition, we continue to expect, as stated in our 2009 annual report that as the economy improves and interest rates rise, our low-cost deposit base will become more valuable and lead to increased earnings."

(Emphasis added).

50.     **2Q:F10 Results Announced**. On May 11, 2010, defendants published a release
announcing purported "Strong" results for the second fiscal quarter of 2010, the period ended
March 31, 2010. This release, entitled "Meta Financial Group, Inc. Reports Strong Second
Quarter Results," noted "Net Income Increases to $5.2 Million, 333% Above Prior Year," and
included as highlights, in part:

- Meta Financial Group (MFG, the Company) 2010 second quarter net
  income was $5.2 million compared to $1.2 million for the same period last
  year

- **Meta Payment Systems (MPS) generated net income of $6.5 million
  compared to $3.5 million last year**

- MetaBank risk-based capital of $73.9 million continues to be well above
  the 10.0% requirement for a "well-capitalized" bank at 15.9%, up from
  12.5% at the prior quarter end

- $8.9 million in new capital was raised during the quarter at then-current
  market pricing, supporting growth in business volume, primarily in the
  MPS sponsorship business line

- **MPS deposits at quarter end were up $104.4 million, or 22%, over
  same period last year**

- Strategic restructuring and refocusing is complete and is expected to yield
  significant operating-cost savings going forward

(Emphasis added).

51.     The May 11, 2010, release also quoted defendant Haahr, who made positive
comments about the near-term health and viability of the Company, in part, as follows:

> President and Chief Executive Officer J. Tyler Haahr commented, **"We are
> encouraged by the dramatic growth in income and our overall results of this
> quarter compared to the same period last year. We believe they demonstrate
> the validity of our long term strategic plan as well as a timely and effective
> utilization of capital, determined and sustained cost management, and
> exceptional ability to produce growth in interest-free deposits."**
>
> **"Once again, our Meta Payment Systems division spearheaded the quarter's
> performance, ratifying the rationale for our recent decision to concentrate on**

19

**the activities of its core, business-to-business servicing expertise," Haahr added.**

"Meanwhile, although we are encouraged by stable to improving credit quality in recent quarters and a solid balance sheet in our community bank segment, we remain convinced that the national and regional conditions have yet to improve sufficiently to warrant more robust growth in our regional banking operations," Haahr concluded.

(Emphasis added).

52.     **3Q:F10 Results Announced**. On August 10, 2010, defendants published a release announcing purported results for the third fiscal quarter of 2010, the period that ended June 30, 2010. This release, entitled, "Meta Financial Group, Inc. Reports Third Quarter 2010 Results, noted "Net income increases to $3.5 million on MPS growth, improved asset quality & cost control, and included as "Highlights," in part:

- Meta Financial Group (MFG, the Company) 2010 third quarter net income was $3.5 million compared to a net loss of $2.6 million in 2009. Year-to-date earnings were $9.9 million versus a $0.7 million loss in 2009.

- **The Meta Payment Systems (MPS) segment generated quarterly net income of $3.0 million compared to $0.1 million last year**

- MetaBank's total risk-based capital ratio of 17.5%, remains well above the 10.0% requirement for a "well-capitalized" bank, and its Tier 1 Core ratio is 7.5% compared to the 5.0% well-capitalized standard

- **MPS June 2010 average deposits increased $151.4 million, or 34%, compared to June 2009**

(Emphasis added).

53.     The August 10, 2010 release also again quoted defendant Haahr, who made positive comments about the near-term health and viability of the Company, in part, as follows:

**President and Chief Executive Officer J. Tyler Haahr commented, "Our third quarter results once again validate our prior initiatives to refocus the Meta Payment Systems business-to-business strategy while streamlining our delivery.** It is worth noting as well that the current quarter demonstrates the strength of our core business lines as it contained a relatively small level of tax-

related income compared to the previous quarter. Meanwhile, we have managed our asset portfolio mix to a more conservative risk profile over the last eighteen months and the June 30th non-performing asset ratio of 0.74% clearly illustrates our current solid position relative to peer banking averages."

"The earnings momentum experienced in the current low interest environment indicates an interest margin opportunity in an increasing rate environment, made possible by our ability to generate large volumes of no-cost deposits. This, along with our sustained cost management program, provides a wider basis for optimism going forward. As in the past, we continue to monitor capital levels relative to expected growth in assets and will consider sources of additional capital if they match our strategic objectives," Haahr concluded.

(Emphasis added).

54.    Even where these Class Period statements regarding the Company's current financial results, *e.g.* quarterly revenue, were literally true, they omitted material information regarding the sustainability of those growing financial results. Indeed, the statements were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, because, *inter alia*:

(a)    The Company achieved this success by illegally targeting low income and poorly educated customers, charging them "exorbitant fees," and claiming to charge a 12.5% "advance fee" that essentially correlated to an annual interest rate that could exceed 650%.

(b)    Defendants were in violation of OTS and FTC provisions prohibiting unfair or deceptive practices in commerce and prohibiting advertising that is inaccurate or misrepresents its services, including statements that, while technically accurate, would mislead a consumer;

(c)    The Company's Customer Service Department had received numerous customer complaints regarding the iAdvance program.

(d)     The Company's iAdvance program improperly circumvented laws prohibiting the garnishment of checks from low income individuals or paid by social security.

(e)     The OTS had been looking closely at Meta Financial's iAdvance program and questioning the program's benefits and viability since 2009.

(f)     Mass layoffs were conducted in January 2010 as a result of a failure of a high-level MPS executive to "follow protocol."

(g)     Defendants' February 9, 2010, statement that "[t]he Company anticipates that revenue momentum will be maintained and earnings capacity will be enhanced through the reduction of the Company's operating expenses" omitted to disclose that Meta Financial's "revenue momentum" was under serious risk because the OTS was investigating iAdvance, one of the Company's key programs in its "core" MPS division, and had the ability to require Meta Financial to end the program entirely, and refund the millions of dollars earned through iAdvance.

(h)     Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results through the inclusion of the iAdvance revenues that had been earned improperly or illegally;

(i)     As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Meta Financial was operating according to plan, or that Meta Financial could achieve guidance sponsored and/or endorsed by defendants.

**Materially False and Misleading Statements About the Company's Disclosure Controls and Internal Controls**

55.     Defendants' 2Q:09 Form 10-Q (filed May 14, 2009), 3Q:09 Form 10-Q (filed August 10, 2009), FY 2009 Form 10-K (filed December 10, 2009), 1Q:F10 Form 10-Q (filed February 9, 2010), 2Q:F10 (filed May 11, 2010), and 3Q:F10 (filed August 10, 2010), were signed and certified by defendants Haahr and Leedom. In addition to making substantially similar statements concerning the Company's operations, including expenses and income, as had been published in the Company's quarterly press releases, the Class Period Forms 10-Q and Form 10-K also contained representations that attested to the purported effectiveness and sufficiency of the Company's controls and procedures. The Forms 10-Q contained statements which read as follows:

### DISCLOSURE CONTROLS AND PROCEDURES

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's "disclosure controls and procedures", as such term is defined in Rules 13a — 15(e) and 15d — 15(e) of the Securities Exchange Act of 1934 (Exchange Act) as of the end of the period covered by the report.

Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that . . . the Company's disclosure controls and procedures were effective to provide reasonable assurance that (i) the information required to be disclosed by us in this Report was recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

### INTERNAL CONTROL OVER FINANCIAL REPORTING

With the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, the Company also conducted an evaluation of the Company's internal control over financial reporting to determine whether any changes occurred during the Company's fiscal quarter . . . , that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. Based on such evaluation, management concluded that, as of the end of the period covered by this report, there have not been any changes in the Company's internal

control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

56.     The FY 2009 Form 10-K contained substantially similar statements to those above. In addition, Form 10-K stated, regarding the Company's "Disclosure Controls and Procedures," that:

> Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective in timely alerting them to the material information relating to the Company required to be included in the Company's periodic SEC filings. There were no significant changes made in the Company's internal controls during the period covered by this report or, to the Company's knowledge, in other factors that could significantly affect these controls subsequent to the date of their evaluation.

57.     Regarding "Management's Annual Report on Internal Control over Financial Reporting," the Form 10-K stated:

> The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company assets that could have a material effect on the financial statements.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of September 30, 2009, based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control-Integrated Framework." After conducting the assessment,

management determined that, as of September 30, 2009, the Company's internal control over financial reporting is effective, based on those criteria.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the SEC that permit us to provide only management's report in this annual report.

58.     Defendants' statements regarding their internal controls and procedures were materially false and misleading when made because Defendants had not established, maintained, or tested adequate internal controls over financial reporting or disclosures. As a result, the Company's Class Period filings contained materially false and misleading statements and omissions regarding, *inter alia*: the Company's iAdvance and refund anticipation loan products; growth; revenue; potential for future revenue; and compliance with laws, rules, and regulations.

**Materially False and Misleading Sarbanes-Oxley Certifications**

59.     In addition to the foregoing, the Company's Class Period Forms 10-Q and Form 10-K also contained certifications by defendants Haahr and Leedom, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, that attested to the purported accuracy and completeness of the Company's financial and operational reports, claiming, in part, that:

- Defendants Haahr and Leedom had reviewed the reports
- "Based on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"
- "Based on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;"
- They were "responsible for establishing and maintaining disclosure controls and procedures" and had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision," "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

procedures," and "[d]isclosed in this report any changes in the registrant's internal control over financial reporting. . ."

- They had "disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control"

- the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

- the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

60.    Defendants' Sarbanes-Oxley Certifications were materially false and misleading when made because the Company's class period reports did contain untrue statements of material fact and omissions of material information, as discussed in detail above, and Defendants had failed to establish, maintain, or test adequate disclosure controls and procedures or internal controls over financial reporting.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF META FINANCIAL IS BELATED DISCLOSED

61.    On October 12, 2010, following the close of trading, defendants filed a report with the SEC that revealed for the first time that the OTS had advised the Company on October 6, 2010, that it had determined that the Company had "engaged in unfair or deceptive acts or practices" in violation of Section 5 of the FTC Act and the OTS Advertising Regulation in connection with the Bank's operation of the iAdvance program, and required the Bank to discontinue all iAdvance lines of credit origination activity by October 13, 2010. In addition to the foregoing, the Company's report also stated, in part, that:

We cannot predict with assurance whether and to what extent the OTS will address other compliance and supervisory matters in addition to those described above. **However, the OTS has informed us that it will address in the future its**

**expectations with respect to reimbursement of borrowers under the iAdvance program.**

**It is anticipated that the discontinuance of the iAdvance program and the potential discontinuance of the tax-related programs (which are subject to OTS approval) will eliminate a substantial portion of MPS' gross profit (net revenue less direct expenses).** In addition, the discontinuance of the iAdvance program may result in elevated rates of nonpayment on outstanding iAdvance loans. We cannot predict the effect on the results of operations or financial condition of the Bank or the Company of future OTS actions or whether we will receive the approval of the OTS Regional Director for the activities described above, or restrictions imposed on us under such approvals, if any.   (Emphasis added).

62.     This report also stated that, based on the OTS's assessment of the Company's third-party relationship risk, enterprise risk management, and rapid growth (attributable to its MPS division), the Company was now required to obtain the prior written approval of the OTS Regional Director prior to:

Enter[ing] into any new third party relationship agreements concerning any credit product, deposit product (including prepaid access), or automatic teller machine or materially amend any such existing agreements (except for amendments to achieve compliance with applicable laws and regulations) or publicly announce any new third party relationship agreements or material amendments to existing agreements;

Originat[ing], directly or through any third party, income tax refund anticipation loans or other loans where the expected source of repayment is a tax refund; and

Offer[ing] an income tax refund transfer processing service directly or through any third party during the 2011 tax season.

63.     On this news, shares of Meta Financial stock fell over 42% from a closing price of $33.23 on October 12, 2010, to close at $18.95 just three trading days later on October 15, 2010.

64.     On October 18, 2010, the Company filed a Form 8-K with the SEC following up on its October 12, 2010, disclosure that the Company would be forced to obtain prior written approval from the OTS before entering into new third party relationship agreements. The October 18, 2010, filing revealed that the Company had "sought such approvals" and "[a]fter

several meetings with the OTS field staff," the Company was "informed on October 14, 2010, that **OTS was not prepared at this time to allow the Bank to enter into any such new third party relationship agreements** . . . ." The filing continued:

> **This means that our program managers will not, without MetaBank obtaining the prior written approval of OTS, be able to amend existing agreements or enter into new agreements with distributors that are also parties to a third party agency relationship with the Bank.** This would include any distributors that have the capability to issue cards and accept the result of the OTS' review of the Bank's operations, cash deposits on those cards**. According to the OTS, written permission to enter into all these types of programs must await the result of the OTS' review of the Bank's operations, which review generally is not expected to occur for up to several months.** Nonetheless, as previously disclosed, MetaBank expects to be able to continue to service its existing third party relationship agreements consistent with their terms and the OTS Directives.
>
> **We are cooperating with the OTS as we continue to correct those aspects of our operations that have been determined by OTS to be deficient, but can offer no assurance as to when or to what extent the OTS will allow the Bank to resume adding new third party relationships.**
>
> If our program managers decide to migrate to other issuing banks while we cannot execute new third party relationship agreements or afterwards, we expect that this could have a material adverse effect on our results of operations and financial condition, depending on the timing and nature and number of such program managers who decide not to continue their existing relationship with the Bank.

(Emphasis added).

65.     On this news, shares of Meta Financial stock continued to fall, plummeting over 30% from the October 15, 2010, closing price of $18.95 to close at $13.29 on October 19, 2010, just two trading days later, on unusually high trading volume.

66.     The October 12 and 18, 2010, filings revealed to investors that Meta Financial had engaged in deceptive and illegal practices with regard to the sale and marketing of its iAdvance lines of credit, and that the OTS investigation–which, undisclosed to investors, had been ongoing since at least as early as Fall 2009—had resulted in the shut down of iAdvance and the Company's inability to enter into new third party agreements in the foreseeable future.

Investors also learned, for the first time, that the Company's revenue in its key division–MPS–which had been increasing rapidly each quarter, could not be sustained because it was achieved through sales and marketing strategies that violated federal rules and regulations and deceived Meta Financial customers. In addition to the loss of revenue related to the termination of iAdvance and new hurdles relating to third party agreements, the filings also revealed that Meta Financial may be forced to reimburse iAdvance customers, and thus disgorge the millions in revenue the Company had claimed from iAdvance throughout the Class Period.

67.     These revelations caused shares of Meta Financial stock to fall precipitously. Shares of Meta Financial stock fell 60% in just five trading days, falling from a closing price of $33.23 per share on October 12, 2010, to close at $13.29 on October 19, 2010, on unusually high trading volume.

## POST CLASS PERIOD DEVELOPMENTS

68.     On January 4, 2011, Meta Financial filed a Form 8-K with the SEC revealing that the Company had received correspondence from the OTS on December 28, 2010, relating to its determination that "the Bank engaged in unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act and the OTS Advertising Regulation in connection with the Bank's operation of the iAdvance line of credit program," and which "advised the Company and the Bank that the OTS:"

- "is presently preparing a Cease and Desist Order for presentation to each of the Company and the Bank,

- will require the Bank to reimburse iAdvance customers in an amount to be determined, and

- is currently considering the need to assess civil money penalties against the Bank."

69.     The Company also filed a February 8, 2011, press release announcing results for the Company's first quarter of 2011. In addition to reporting declining total revenue and non-interest income, defendants reported that MPS revenue had decreased by 25.6%, "primarily due to the discontinuance of the iAdvance and tax-related loan programs."

### CAUSATION AND ECONOMIC LOSS

70.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Meta Financial's stock price and operated as a fraud or deceit on Class Period purchasers of Meta Financial's stock by misrepresenting the Company's financial results. Over a period of approximately thirteen months, defendants improperly inflated the Company's financial results. Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Meta Financial declined precipitously--evidence that the prior artificial inflation in the price of Meta Financial's shares was eradicated. As a result of their purchases of Meta Financial stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

71.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of Meta Financial's business and future growth prospects. During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control its financial services and products, and consistently reported growth within the range of expectations, and within the range for which the Company was adequately reserved. These claims caused and maintained the artificial inflation in Meta Financial's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

72.     Defendants' false and materially misleading statements had the intended effect of causing Meta Financial's shares to trade at artificially inflated levels throughout the Class Period -- reaching a Class Period high of over $35.00 per share in late-August 2010, only weeks before the truth about the Company was revealed. After investors learned the truth about the Company, and learned that defendants would no longer be able to offer iAdvance products and certain other financial and tax services, shares of the Company collapsed. Defendants' belated disclosures had an immediate, adverse impact on the price of Meta Financial shares.

73.     These belated revelations also evidenced defendants' prior falsification of Meta Financial's business prospects due to defendants' false statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Meta Financial's share price and investors were damaged as a result of the related share price decline.

74.     The decline in Meta Financial's stock price at the end of the Class Period over multiple disclosures was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Meta Financial's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct. During the same period in which Meta Financial's share price fell as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

75.     The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Meta

Financial's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed. The dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced, in part, by the chart below:



## ADDITIONAL SCIENTER ALLEGATIONS

76.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Meta Financial, their control over, and/or receipt and/or modification of Meta Financial's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Meta Financial, participated in the fraudulent scheme alleged herein.

77.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme: (a) deceived the investing public regarding Meta Financial's business, operations, management and the intrinsic value of Meta Financial common stock; (b) enabled defendants to artificially inflate the price of Meta Financial shares; (c) enabled defendants to arrange the sale of millions of dollars of Meta Financial shares while in possession of material adverse non-public information about the Company; and, (d) caused plaintiff and other members of the Class to purchase Meta Financial common stock at artificially inflated prices.

78.    On or about March 3, 2010, the Company completed two common stock private placements, raising $8.9 million on the sale of 415,000 shares, representing 13.5% of the Company's current outstanding shares. The share sales were sold at market prices, artificially inflated by defendants' publication of materially false and misleading statements about the Company.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

79.    At all relevant times, the market for Meta Financial's common stock was an efficient market for the following reasons, among others:

(a)      Meta Financial's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

(b)      As a regulated issuer, Meta Financial filed periodic public reports with the SEC and the Nasdaq;

(c)      Meta Financial regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d)      Meta Financial was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

80.      As a result of the foregoing, the market for Meta Financial securities promptly digested current information regarding Meta Financial from all publicly available sources and reflected such information in Meta Financial stock price. Under these circumstances, all purchasers of Meta Financial common stock during the Class Period suffered similar injury through their purchase of Meta Financial common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

81.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Meta Financial who knew that those statements were false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Meta Financial between May 14, 2009, and October 18, 2010, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

83.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Meta Financial common shares were actively traded on the Nasdaq. As of August 6, 2010, the Company had over 3.085 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other

members of the Class may be identified from records maintained by Meta Financial or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

85.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

          (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

          (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Meta Financial; and

          (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BASIS OF ALLEGATIONS

88.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Meta Financial, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>FIRST CLAIM</u>

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

89.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did**:** (a) deceive the investing public regarding Meta Financial's business, operations, management and the intrinsic value of Meta Financial common stock; (b) enable defendants to artificially inflate the price of Meta Financial shares; (c) enable defendants to arrange the sale of millions of dollars of Meta Financial shares while in possession of material adverse non-public information about the Company; and, (d) cause plaintiff and other members of the Class to purchase Meta Financial common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and

course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

91.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and, (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Meta Financial's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

92.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Meta Financial as specified herein.

93.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Meta Financial's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Meta Financial and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of Meta Financial common stock during the Class Period.

94.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and, (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

95.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing Meta Financial's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Meta Financial common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Meta Financial's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Meta Financial common stock during the Class Period at artificially high prices and were damaged thereby.

97.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Meta Financial was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Meta Financial common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

98.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

99.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.     The Individual Defendants acted as controlling persons of Meta Financial within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

41

103.     As set forth above, Meta Financial and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 14, 2011                     s/ Kim E. Miller

KIM E. MILLER (admitted *pro hac vice*)
MELISSA RYAN CLARK

42

**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: melissa.clark@ksfcounsel.com

LEWIS S. KAHN  (admitted *pro hac vice*)
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

**Lead Counsel for Lead Plaintiff and the Class**

WARD A. ROUSE
**BERG, ROUSE, SPAULDING & SCHMIDT, PLC**
4940 Pleasant Street
West Des Moines, IA 50266
Telephone: 515-223-9000
Fax: 515-226-8710

**Local Counsel for Lead Plaintiff and the Class**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

/s/ Kim E. Miller

KIM E. MILLER